IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MECHELLE CHERRY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:04cv0036 |
| ) | |
| UNIPRES U.S.A., INC. ) | Judge Thomas A. Wiseman, Jr. |
| ) | |
| Defendant. ) | |

**MEMORANDUM**

Plaintiff Mechelle Cherry filed this action against Defendant Unipres U.S.A., Inc. ("Unipres") alleging unlawful racial and sexual discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the Civil Rights Act of 1866, 42 U.S.C. § 1981; and the Tennessee Human Rights Act, Tenn Code Ann. § 4-21-401 *et seq.* ("THRA"); and unlawful retaliation in violation of the Family and Medical Leave Act of 1993, 29 U.S.C. § 2615(a)(2) ("FMLA"). Unipres has filed its Motion For Summary Judgment (Doc. No. 26) along with a supporting Memorandum Of Law (Doc. No. 29), Statement Of Undisputed Facts (Doc. No. 30), and various exhibits and affidavits. Cherry has filed her Response To Defendant's Statement Of Undisputed Facts (Doc. No. 33) and Response In Opposition To Defendant's Motion For Summary Judgment (Doc. No. 31), in which she concedes that Unipres is entitled to judgment in its favor on her claims of race discrimination and FMLA retaliation. She contends, however, that material issues of disputed fact preclude summary judgment of her sex discrimination claims under Title VII and the THRA.

Based upon Cherry's concessions, the Court will grant summary judgment in favor of Unipres and dismiss Cherry's race discrimination and FMLA retaliation claims. With respect to the gender discrimination claims, as set forth below, the Court finds that Cherry has failed to establish a *prima facie* case of discrimination and that Unipres is therefore entitled to summary judgment of those claims as well.

**I. STANDARD OF REVIEW**

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[S]ummary judgment

will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

In evaluating a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. Matsushita, 475 U.S. at 587; Wade v. Knoxville Utils. Bd., 259 F.3d 452, 460 (6th Cir. 2001). Justifiable inferences based on facts are also to be drawn in favor of the non-movant. Kalamazoo River Study Group v. Rockwell Int'l Corp., 171 F.3d 1065, 1068 (6th Cir. 1999). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.' " Little Caesar Enters., Inc. v. OPPCO, LLC, 219 F.3d 547, 551 (6th Cir. 2000) (quoting Liberty Lobby, 477 U.S. 242, 249). If, however, the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which the nonmoving party has the burden, the moving party is entitled to summary judgment as a matter of law. See Williams v. Ford Motor Co., 187 F.3d 533, 537–38 (6th Cir. 1999).

To preclude summary judgment, the nonmoving party "is required to present some significant probative evidence that makes it necessary to resolve the parties' differing versions of the dispute at trial." Gaines v. Runyon, 107 F.3d 1171, 1174–75 (6th Cir. 1997). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Shah v. Racetrac Petroleum Co., 338 F.3d 557, 566 (6th Cir. 2003) (quoting Liberty Lobby, 477 U.S. at 252). Thus, the court should also consider whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Amway Distribs. Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Liberty Lobby, 477 U.S. at 251–52). If the evidence offered by the nonmoving party is "merely colorable," or "is not significantly probative," or enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. Liberty Lobby, 477 U.S. at 249–52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment

inappropriate." Hill v. White, 190 F.3d 427, 430 (6th Cir. 1999) (citations omitted).

## II. FACTUAL BACKGROUND

Unipres is a manufacturing facility based in Portland, Tennessee engaged in making metal stamping and structural steel parts for the automotive industry. The manufacturing process at Unipres is divided among the Press Department, the Assembly Department, and the Small Parts Plant. Cherry was employed in the Press Department, which runs stamping presses that mold steel into components to be assembled by personnel in the Assembly Department.

At all times relevant to this proceeding, Unipres had in effect a "Code of Conduct" setting forth the procedures for dealing with employee misconduct and poor performance. Under the Code of Conduct, Unipres issues written warning notices for correcting employee actions not serious enough to warrant immediate discharge. More serious offenses are punished through suspensions or termination. A "serious violation of a safety regulation" is listed as one of the offenses for which immediate discharge may be warranted. The Code is intended to be a progressive disciplinary system, allowing supervisors and managers to impose the appropriate level of discipline for the misconduct or offense, depending on the circumstances.

Cherry began working at Unipres as a temporary employee through the Sumner County Employment Exchange in August 2001. She submitted an application of employment directly to Unipres in September 2001 and received an offer of employment in November 2001. She was hired by Unipres as a "Contingent Temporary Technician" for a ninety-day period, after which time her employment would continue on a month-to-month basis until she was hired as a regular, full-time employee. She was assigned to work the third shift under the supervision of Loy Russell.

Cherry applied for FMLA leave in March 2002, citing stomach problems. Her request was denied because she had not worked at Unipres the requisite length of time and therefore was ineligible for FMLA leave. Cherry applied for FMLA leave again in May 2002, again citing stomach problems, although she also was pregnant at that point. Although she was still ineligible for FMLA leave, Unipres granted Cherry a medical leave of absence. Her physician released her to return to work at Unipres on September 23, 2002, subject to a restriction that she not lift more than five pounds. It is undisputed that one of the job requirements for her position was that she be able to lift 40 pounds without mechanical aid, which meant that

3

she was not able to perform all the essential functions of her job while under the five-pound lifting restriction.

Cherry maintains that Unipres could have accommodated her lifting restriction by re-assigning her to another area. Unipres's position is that, pursuant to its written "Return To Work Policy," an employee with lifting restrictions resulting from a work-related injury will be accommodated, but an employee whose restriction does not result from a work-related injury will not be accommodated. Instead, that employee will be placed on temporary leave status. Cherry therefore remained on leave after September 23, 2002, even though her physician had released her to return to work. Regardless, Cherry went back on medical leave on September 27, 2002, just three days after being released to return to work. Cherry claims that she was granted medical leave partly to accommodate her need for prenatal care.

Cherry maintains, albeit somewhat vaguely, that Unipres's decision to place her on leave during that three-day window before she went back on medical leave, instead of accommodating her lifting restriction, constituted an adverse employment action that resulted from discrimination on the basis of her gender. Unipres maintains that it has never accommodated any employees with non-work-related injuries who cannot lift more than five pounds. In response, Cherry claims that she observed a male employee, whom she could not identify, whose need for a weight restriction was accommodated, and she also observed another white female, Diana Cribb, whose need for a weight restriction was accommodated. Cherry further argues that the policy should not have applied to her because she was pregnant, and that pregnancy should not constitute an "injury that fell within the ambit of Unipres' 'Return to Work Policy.'" (Doc. No. 33, at 12.)

Cherry remained on medical leave throughout the fall of 2002. She delivered her baby in December 2002 and was released to return to work without restrictions on February 5, 2003. Unipres put her back to work at that time. Unipres maintains that she was still on Contingent Employee status at that point. Cherry attempts to dispute that point, claiming that she was told by three sources at the time she was hired that she would be a Contingent Employee for just three months, and then after that would be a full-time employee with insurance benefits and a company uniform, and that she did in fact receive employee benefits, including medical leave and short-term disability leave, after ninety days. Cherry has not pointed to any documentation that substantiates her subjective belief that she was no longer a contingent employee. Regardless, there is no dispute that she remained at all times an at-will employee.

When she returned to work, Cherry was initially placed back on third shift. Shortly after she returned to work, however, Unipres eliminated its third shift. At that time, Cherry bid on and was transferred to first shift, effective as of February 17, 2003. Cherry's new supervisor on first shift was Brian Keen.

According to Cherry, Keen was much more demanding than her supervisor on third shift; he "constantly stayed on [her] for nothing"; he "nagged" her about "little things," and in particular chastised her for things for which he did not chastise other male employees. (Doc. No. 33, Statement and Response Nos. 36–38.) Cherry felt Keen simply did not like her, and he did not treat any other employees, male or female, the way he treated her. (Doc. No. 33, Statement and Response No. 39.)

Approximately one month after Cherry returned to work, on March 6, 2003, Keen placed Cherry on a performance improvement plan for a safety violation—failing to wear arm guards while handling parts. Cherry felt this action was unfair because she had previously been told, while working third shift, that arm guards were not required if the employee was wearing a long-sleeve shirt. Cherry also claimed most employees did not wear the arm-guards on regular basis but were not subject to disciplinary action. Cherry initially claimed that two other employees, Kevin Stewart (white male) and Sherry Blakemore (black female), were not wearing arm guards the day she was written up for a safety violation, but that she alone was written up because she had previously taken medical leave relating to her pregnancy and childbirth. It is now undisputed, however, that both Stewart and Blakemore were written up for the same offense on the same day Cherry was written up. (See Affidavit of Renee Willhite (Doc. No. 28) ¶ 5 and Exs. 2 and 3.)

On March 10, 2003, Keen gave Cherry a written performance evaluation. On that evaluation, Keen was critical of Cherry's performance and did not recommend her for regular employment because he felt she needed too much improvement. Cherry felt the evaluation was unfairly harsh and also argues that she already was, or should have been considered to be, a regular employee at that time because she was already receiving employee benefits. Regardless, instead of recommending immediate termination, Keen extended Cherry's contingent employment status an additional thirty days to allow another review at that time. Her contingent employment apparently was extended again on April 10.

On April 16, 2003, Cherry and a male co-worker, James LaMountain, were working on the Number 5 tandem line when their lead, Jason Holley, directed them to change the die on the machine. Cherry

5

testified in her deposition that she had never changed a die before; she had only watched. (Cherry Dep. at 106:24–25.) She also claims she told Holley she did not know how to change the die but he told her to do it anyway. Contemporaneous notes maintained by Cherry indicate, on the contrary, that the reason Holley asked her and LaMountain to change the die in the first place was because they were two of only three people on the shift who knew how to change it. The notes also do not indicate that she told Holley she did not know how to change the die. When confronted with these discrepancies, Cherry admitted she had changed dies on other machines, just not the Number 5 tandem. (Cherry Dep. at 112:9–23.)

She and LaMountain attempted to change the die but apparently began raising the ram with the die still on it because they failed to remove a bolt from the top of the die. (See Cherry Dep. at 107:1–13.) When this occurred, LaMountain ran to get Jason Holley. When Holley got there, Cherry asked him what she was supposed to do and he said, "That's okay, I'll get it up." (Cherry Dep. at 107: 15–22.) Holley finished changing the die. Cherry admits that changing the die improperly could result in injury. Cherry admits that her actions constituted a safety violation but denies that she was responsible for the violation inasmuch as Unipres supposedly knew she did not know how to change the die, and further denies that it constituted a "serious" safety infraction. In fact, the record is devoid of any evidence that would tend to show that this incident was considered to be a serious safety infraction.

Cherry asked Holley if she would be written up for unsafely changing the die and he said yes. She told him she thought LaMountain should also be written up if she was. In fact, the next day, April 18, 2003, Cherry and LaMountain allegedly both received written safety violations and were both fired. In Keen's final evaluation of Cherry, conducted in conjunction with her termination, Keen noted he had seen some improvement in Cherry's performance but that "safety violations is [sic] a pattern Unipres cannot except [sic]."[1] Unipres's stated reason for terminating Cherry was "not meeting company expectations." (Cherry

---

[1] Unipres cites to "Cherry Dep. at 26" in support of the allegation regarding the content of the final evaluation. (Doc. No. 30, Statement No. 59.) That reference is not correct, and the Court presumes Unipres actually intended to reference *Exhibit* 26 to Plaintiff's deposition, which apparently is Keen's final evaluation of Plaintiff. Exhibit 26 is not among the documents filed in conjunction with the Defendant's motion, nor is the second written safety violation that Plaintiff allegedly received. However, Plaintiff admits she received the second safety write-up and admits that her final evaluation contains the quoted statement by Keen, so the Court finds that the Plaintiff has stipulated that she was written up for a safety violation in connection with the die-replacing incident (though she disputes the fairness of the action) and that Keen referenced that violation in his final evaluation.

6

Dep. Ex. 28.)

Cherry appealed the termination. The Appeals Committee gave Cherry additional time to submit documentation supporting her appeal, but Cherry failed to provide the Committee with any evidence to substantiate her claim that she was terminated unfairly. Based on that failure, the Committee denied her appeal.

## III. DISCUSSION AND ANALYSIS

Cherry's remaining claims for sex discrimination are brought under Title VII and the THRA. Because the "stated purpose and intent of the [THRA] is to provide for execution within Tennessee of the policies embodied in the federal civil rights laws," Campbell v. Fla. Steel Corp., 919 S.W.2d 26, 31 (Tenn. 1996), the analysis of sexual discrimination claims under the THRA is the same as under Title VII. See also Tenn. Code Ann. § 4-21-101(a) ("It is the purpose and intent of the general assembly by this chapter to . . . [p]rovide for execution within Tennessee of the policies embodied in the federal Civil Rights Acts of 1964, 1968, and 1972. . . ."); Wade v. Knoxville Utils. Bd., 259 F.3d 452, 464 (6th Cir. 2001). Accordingly, the analysis of Cherry's Title VII claim applies to her THRA claim as well.

Under Title VII and the THRA, a plaintiff seeking to establish a claim of sex discrimination must first prove a *prima facie* case of discrimination. Tex. Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 252–53 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). An employee "may establish a *prima facie* case of discrimination either by presenting direct evidence of intentional discrimination by the defendant, or by showing the existence of facts which create an inference of discrimination." Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1248 (6th Cir. 1995) (internal citations omitted). Where, as here, no direct evidence of discrimination is available, the plaintiff may establish her *prima facie* case of gender discrimination with indirect, circumstantial evidence by showing that (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was treated differently from similarly situated members of the unprotected class. McDonnell Douglas, 411 U.S. at 902; Knox v. Neaton Auto Prods. Mfg., Inc., 375 F.3d 451, 456–57 (6th Cir. 2004).

If, and only if, the plaintiff establishes a *prima facie* case, then the burden shifts back to the defendant/employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection."

7

Burdine, 450 U.S. at 253 (quoting McDonnell Douglas, 411 U.S. at 802); Dennis v. White Way Cleaners, L.P., 119 S.W.3d 688, 694 (Tenn. Ct. App. 2003). If the defendant carries that burden, then the plaintiff must prove that the proffered reasons are pretextual. Burdine, 450 U.S. at 253 (citing McDonnell Douglas, 411 U.S. at 804). Pretext can be established by a direct showing that a discriminatory reason more likely motivated the employer or by an indirect showing that the employer's explanation is not credible. Id. at 256.

Cherry has met the first element of her *prima facie* case: She is a woman and therefore a member of a protected class for purposes of a gender-discrimination claim. Each of the additional elements of a *prima facie* case are discussed separately below.

### A. Allegedly Adverse Employment Actions Taken Against Cherry

Cherry clearly suffered an adverse action when her employment was terminated. She also claims, rather vaguely, that she suffered an adverse employment action when she transferred from third shift to first shift, and when she was placed on leave status rather than being accommodated when she returned to work with a five-pound lifting restriction in September 2002. The Sixth Circuit has addressed the issue of what constitutes an "adverse employment action" as follows:

> [A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

Hollins v. Atlantic Co., 188 F.3d 652, 662 (6th Cir. 1999). In addition, "[t]he Sixth Circuit has consistently held that *de minimis* employment actions are not materially adverse and, thus, not actionable." Bowman v. Shawnee State Univ., 220 F.3d 456, 462 (6th Cir. 2000).

Plaintiff's transfer to first shift after Unipres closed down the third shift did not result in a *materially* adverse change in her employment status or in the terms and conditions of her employment: She was not demoted; her pay was not decreased; her benefits did not change; her responsibilities did not change appreciably. Moreover, the action affected all employees on the third shift equally. That change therefore does not qualify as an adverse employment action.

It appears, however, that being placed on unpaid leave status rather than being put to work during the three-day window in September 2002 resulted in a material change in job responsibilities and pay, at least

8

during those three days. Accordingly, the Court finds that being placed on leave status effected a materially adverse change in Plaintiff's employment status and therefore, at least arguably, qualified as an adverse employment action, despite the fact that the leave status imposed by Unipres lasted only three days.

## B. Whether Cherry Was "Qualified" For Her Job

Unipres argues that Cherry was not qualified for her job on the basis that she received two negative performance evaluations and two safety violations during her first two months back on the job after her extended leave. This argument is circular, however, because Cherry claims that the negative evaluations and the safety violations are evidence of the discrimination against her.

Cherry, on the other hand, points out that she was hired in November 2001, was able to perform all the essential functions of the job except when she was pregnant and on leave, and had satisfactorily performed the job and received satisfactory evaluations prior to her being transferred to first shift and placed under the supervision of Brian Keen. Unipres does not dispute any of those facts. The Court therefore finds, for purposes of this motion, that Cherry has established that she was basically qualified for the job.

## C. Whether Similarly Situated Non-Protected Employees Were Treated Differently

### *(1) Unipres's Failure To Accommodate the Lifting Restriction In September 2002*

It is undisputed that, when Cherry returned to work in September 2002 after a prolonged medical leave, Unipres placed her back on temporary leave status rather than allowing her to work in a position that would accommodate her lifting restriction. Three days later, Cherry's physician placed her back on medical leave, so the failure to accommodate became moot after that.

Assuming that the three-day leave period in September 2002 constituted an adverse employment action, Unipres has offered evidence that it has never accommodated weight restrictions for employees other than those who are injured on the job. Cherry testified vaguely that she knew of a male employee, whose name she did not know, whose restriction on lifting was accommodated. She does not indicate what the restriction was, whether the man was injured on the job, or what type of accommodation was made for him. In other words, there is no evidence that the unidentified male employee was similarly situated to Cherry in all relevant respects. Moreover, the Sixth Circuit has repeatedly held that testimony consisting of "nothing more than rumors, conclusory allegations and subjective beliefs . . . [is] wholly insufficient evidence to

establish a claim of discrimination as a matter of law." Mitchell v. Toledo Hosp., 964 F.2d 577, 585 (6th Cir. 1992). Cherry clearly carries the burden of proof on the issue of disparate treatment, and she has failed to present credible evidence that any similarly situated male employee, or any other employee at all, was treated differently from her with regard to Unipres's Return To Work Policy.

Of course, men do not get pregnant, and Cherry apparently is also trying to argue that the fact that she was pregnant at the time and that the pregnancy was the root cause of her need for an accommodation somehow changes the equation, placing a higher burden on her employer to accommodate her restriction.[2] Such argument is unavailing. The Pregnancy Discrimination Act ("PDA") does not require preferential treatment of pregnant employees. It simply "protect[s] female workers from being treated differently from other employees simply because of their capacity to bear children." Int'l Union v. Johnson Controls, Inc., 499 U.S. 187, 205 (1991), quoted in Mullett v. Wayne-Dalton Corp., 338 F. Supp. 2d 806, 811 (N.D. Ohio 2004). "Under [the PDA], the treatment of pregnant women in covered employment must focus not on their condition alone but on the actual effects of that condition on their ability to work. Pregnant women who are able to work must be permitted to work on the same conditions as other employees; and when they are not able to work for medical reasons, they must be accorded the same rights, leave privileges and other benefits as other workers who are disabled from working." Mullett, 338 F. Supp. 2d at 812 (quoting Carney v. Martin Luther Home, Inc., 824 F.2d 643, 646 (8th Cir. 1987)). As another district court has observed in a case factually similar to this one, a policy affording light-duty only for employees injured on the job is "disparate treatment [that is] clearly intentional, but . . . does not equal unlawful discrimination, because the disparate treatment complained of does not involve a classification that singles out pregnancy-based disability for less favorable treatment." Daugherty v. Genesis Health Ventures of Salisbury, Inc., 316 F. Supp. 2d 262, 265 n.3 (D. Md. 2004) (granting summary judgment for defendant, holding that employer's failure to provide light-duty assignments to pregnant workers did not violate PDA when the employer had a long-standing policy of withholding light-duty assignments for all employees who had work restrictions not resulting from on-the-job

---

[2]In her Response To Defendant's Statement Of Undisputed Facts, Cherry notes repeatedly that Unipres's Return To Work Policy did "not apply to any employee on maternity leave." (See, e.g., Doc. No. 33, Responses to Statement Nos. 27, 29, 71, 76.) That fact is immaterial because Cherry was not on maternity leave the three days in September 2002 during which her doctor released her to work.

10

injuries).

Because Cherry has not demonstrated that any similarly situated male employees were treated differently from her, she fails to establish a *prima facie* case of gender discrimination based upon Unipres's failure to accommodate her medical restriction in September 2002.³

### *(2) Cherry's Termination in April 2003*

The events leading up to Cherry's termination include two alleged safety violations and two allegedly sub-par performance evaluations. The first safety violation was for failure to wear Kevlar arm guards; the second was in connection with replacing a stamp die in an unsafe manner.

Cherry argues that other employees and "leads" engaged in safety violations, such as failure to wear arm guards, for which they were not written up. Other than her own non-specific testimony in that regard, Cherry offers no concrete evidence regarding whether these employees were similarly situated "in all of the relevant aspects." Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998). The only evidence in the record concrete enough to evaluate is that presented by Unipres, which shows that two other employees, one a black female and the other a white male, were written up for failure to wear arm guards by the same supervisor on the same day Cherry was. Accordingly, she cannot establish with this incident that she was subject to disparate treatment.

Similarly, with respect to the die-replacing incident, it is undisputed that James LaMountain, a male employee who was assisting Cherry to replace the die (or whom Cherry was assisting), was fired in connection with the same incident. Cherry does not offer evidence of any similar safety violations by other employees. She therefore cannot establish that any male employee was subject to more favorable treatment for the same safety violation. Cherry attempts to establish that LaMountain was treated better than she was because she was held to the same performance expectation as he even though he was better trained and more experienced. The fact is, they were both terminated, so LaMountain was not treated better than she. Moreover, Plaintiff's protestations only serve to suggest that she and LaMountain were not similarly situated

---

³Cherry does point to another white woman, Diana Cribb, whose lifting restriction was accommodated. Unipres has offered evidence that Cribb was suffering from an on-the-job injury, so she was not similarly situated to Cherry in all relevant respects. Regardless, because Cribb was also female, Unipres's allegedly disparate treatment of her could not support Cherry's claim of discrimination.

11

in all relevant respects after all, but she does not offer any comparison with an employee who was similarly situated with respect to training and experience..

Finally, with respect to the termination of her employment, Cherry has not offered evidence of any other employees—contingent or otherwise—who were written up for two comparable safety violations within two months of each other but were not terminated. She argues only that Keen "constantly nagged her—but not male employees—about cleaning her work area" and otherwise monitored her more closely and more harshly than he did male employees. However, Plaintiff's subjective belief that she was treated more harshly does not constitute evidence of disparate treatment. Cf. Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992) (holding that a black employee failed to establish she was "similarly situated" to white employees who had not been discharged for allegedly having done "worse things" and therefore could not establish a *prima facie* case of discrimination).

As a result, the Court concludes that Cherry has failed to show that she was treated differently from any similarly situated non-minority employees. Consequently, Cherry cannot establish a *prima facie* case of gender discrimination, and Unipres is entitled to summary judgment in its favor.

### IV. CONCLUSION

Plaintiff Mechelle Cherry has conceded that Defendant Unipres is entitled to summary judgment of Cherry's race discrimination and FMLA retaliation claims. Further, Cherry has failed to establish a *prima facie* case of gender discrimination in violation of Title VII or the THRA because she has not demonstrated that similarly situated male employees were treated better than she was treated for the same or similar misconduct. Accordingly, Unipres is entitled to summary judgment in its favor and Cherry's claims will be dismissed in their entirety.

An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge

12

Case 3:04-cv-00036   Document 37   Filed 02/06/06   Page 12 of 12 PageID #: 277